Argued February 21, affirmed March 24, reconsideration denied
April 30, petition for review denied May 28, 1975

STATE OF OREGON, *Respondent, v.* RONALD G.
FORSYTH (No. 74-02-0388 Cr), *Appellant.*

533 P2d 176

*Howard R. Lonergan,* Portland, argued the cause and filed the briefs for appellant. A supplemental brief was filed for appellant by Martha Goldin and Saltzman and Goldin, Hollywood, California, and Howard R. Lonergan, Portland.

*Thomas H. Denney,* Assistant Attorney General, Salem, argued the cause for respondent. With him on the briefs were Lee Johnson, Attorney General, and W. Michael Gillette, Solicitor General, Salem.

Before Schwab, Chief Judge, and Foley and Fort, Judges.

FORT, J.

Defendant was indicted on a charge of rape in the first degree in violation of ORS 163.375. Following a jury trial he was convicted on said charge and sentenced to an indeterminate term of imprisonment not to exceed seven years.

■ Defendant first challenges the trial court's failure to grant his motion for directed verdict. On review we look to the evidence most favorable to the state's case and determine whether such is sufficient to allow a jury to infer defendant's guilt beyond a reasonable doubt. *State v. Gross,* 19 Or App 187, 526 P2d 1050 (1974).

■ The prosecutrix was scheduled to be at work at 7 a.m. on the day in question. She overslept and was unable to catch the bus she had hoped to take to her downtown place of employment. Shortly before 6:30 a.m., while she was anxiously awaiting a second bus, defendant offered her a ride downtown. Fearing that she would otherwise be late for work, she accepted. In order "to be on the safe side," she told him that she had to be at work at 6:30.

On the pretense of looking for a friend's apartment in order to give him a ride the defendant drove to Water Avenue in the Portland riverfront area. He

stopped the car by some railroad tracks, reached over, and grabbed the prosecutrix by the shoulders. Her glasses flew to the driver's side of the car and were damaged. Her testimony continued:

"A  I started fighting and flinging my arms wildly so that I thought I could hurt him and I could get out of the car. I tried to unlock the doors, but he kept pushing the little button back down. When I would unlock them he would push it back down and lock it. And I remember somehow I got onto the driver's side of the car and I tried to unlock that side too, but he had locked it.

"Q  How did you get from the passenger side to the driver's side?

"A  I was just fighting.

"Q  Did you ever hit him?

"A  Yes, I did.

"Q  How did that happen?

"A  I was just flinging my arms and I must have smacked him in the nose, because he grabbed me then and he shook me and he said, 'Look, I'm stronger than you and if you don't behave yourself I'll hurt you.' And I was so scared."

The prosecutrix further testified that at about this time she attempted to open an avenue of escape by suggesting that they move to the back seat of the car to have intercourse. Defendant contends this statement is sufficient alone to support his motion. The following transpired on cross-examination:

"A  I said 'Okay, okay. Let's get in the back seat.'

"Q  And when you said that, wasn't it your intention to imply to Mr. Forsyth that you had decided it was okay to have intercourse with him? That's a true statement, isn't it?

"A  Yes, it is. I wanted to run.

"Q But you meant to imply to Mr. Forsyth that it was okay with you to have intercourse with him in the back seat. That's true, isn't it?

"A Yes, it is.

"Q You didn't tell him that it was in the back of your mind to run at this time, did you?

"A No."

However, according to her testimony defendant refused to allow her at any time to get into the rear seat. Her testimony as to the subsequent events, additionally relied upon by defendant, included the following:

"A * * * He turned me around so that I was leaning against the door with my back and shoulders, and my legs were over by the controls of the car.

"Q Were your pants on or off at that time?

"A They were on.

"Q What happened next?

"A He pushed me down on the seat so that my—just my shoulders and head were against the door.

"Q How did he push you down?

"A He pushed me down on my shoulders.

"Q Did he hold you down?

"A Yes, he did.

"Q What did he do then?

"A He made me move my feet up onto the seat and he started to take my pants down, and I said, 'No.'

"* * * * *

"Q Did you attempt to stop him?

"A Yes, I did.

"Q How did you do that?

"A I started fighting again.

"Q  In what manner?

"A  Just flinging my arms.

"Q  Did it do any good?

"A  No, it didn't.

"Q  What happened then?

"A  He made me—my legs were up on the seat and he started to pull my pants down and I said, 'No.' And he said—I don't remember what he said, just that I kept saying, 'No, I'm sorry I can't.' And he said he could tell and if I was a virgin he wouldn't do it. And so he pushed me down on the seat so that my head and shoulders were against the car door and he pulled my pants down. And even then I tried to unlock the door by just reaching up like this and unlocking the door, but he immediately locked it. (Indicating)

"Q  What was the next thing you can recall happening, Miss [prosecutrix]?

"A  He pulled my pants down so that they were wrapped around my legs. And I remember I kicked off my shoes.

"Q  Why did you do that?

"*  *  *  *  *

"A  *  *  *  —I was going to kick my pants off and I couldn't get my pants off with my shoes on. And I thought if I could get out of the car I could run.

"*  *  *  *  *

"Q  Go on. What happened then?

"A  I kicked them off and he forced my legs apart  *  *  *."

There was also testimony that at 7:09 a.m. on the day in question the police were called to the prosecutrix's place of employment. On arrival at 7:15, one officer testified:

"Q  Did you make contact with [prosecutrix]?

"A  Yes, sir. I did.

"Q What kind of shape was she in?

"A When we first arrived she was leaning up against a guard stand, something similar to the podium here. She was shaking and she had a very wild look in her eye, almost fear. Close to panic.

"* * * * *

"Q Did you attempt to talk to Miss [prosecutrix] at that time?

"A Yes, sir. I did. I couldn't get anything really coherent out of her. We got a license number to an automobile she had written down. And she made some statements that I couldn't understand. They were incoherent and really not understandable at all."

The officer testified on cross-examination:

"Q And from time to time you see people get upset because they feel guilty; don't you?

"A Yes, sir."

And on redirect:

"Q Did Miss [prosecutrix] appear to you to be acting guilty like these other persons you testified to?

"A No, sir. What I recognized was the fear and being afraid."

The testimony further showed that the defendant and the prosecutrix were complete strangers to one another at the time she got into his car.

Defendant contends that the evidence showed as a matter of law the victim's consent to sexual intercourse, and a lack of the requisite force or threat of force.

ORS 163.375(1) provides in pertinent part:

"A person who has sexual intercourse with a

female commits the crime of rape in the first degree if:

"(a) The female is subjected to forcible compulsion by the male * * *."

"Forcible compulsion" is defined in ORS 163.305(3) as "physical force that overcomes earnest resistance; or a threat, expressed or implied, that places the person in fear of immediate death or serious physical injury to himself or another person * * *."

The Commentary to Oregon's 1971 Criminal Code sets forth the following discussion of the subject elements of the crime:

"The other two elements of the crime of rape, *i.e.,* force and the absence of consent of the victimized female, are closely connected in proof of fact. Proof of these two elements is dependent upon proof of resistance. This rule was stated in *State v. Colestock,* 41 Or 9, 67 P 418 (1902):

" 'While it may be expected in such cases, from the nature of the crime, that the utmost reluctance would be manifested, and the utmost resistance made which the circumstances of a particular case would allow, still, to hold, as a matter of law, that such manifestation and resistance are essential to the existence of the crime, so that the crime could not be committed if they were wanting, would be going farther than any well-considered case in criminal law has hitherto gone. . . *This importance of resistance is simply to show two elements in the crime,—carnal knowledge by force by one of the parties, and nonconsent thereto by the other. These are essential elements and the whole question is one of fact for the jury.'* (Emphasis supplied.) At 12.

"The necessity and amount of resistance was

considered at length in *State v. Risen,* supra [192 Or 557, 235 P2d 764 (1951)] at 561-562:

" 'The woman must resist by more than mere words. Her resistance must be reasonably proportionate to her strength and her opportunities. It must not be a mere pretended resistance, but in good faith and continued to the extent of the woman's ability until the act has been consummated. 44 Am. Jur., Rape, § 7; *People v. Dohring,* 59 N.Y. 374, 17 Am. Rep. 349, 355; *Mills v. United States,* 164 U.S. 644, 648, 41 L. ed. 584, 17 S. Ct. 210; *Brown v. State,* 127 Wis. 193, 199, 106 N.W. 536; *Bailey v. Commonwealth,* 82 Va. 87, 107, 3 Am. St. Rep. 89.  * * *'

"*State v. Christensen,* 119 Or 333, 249 P 366 (1926), and *State v. Cook,* 242 Or 509, 411 P2d 78 (1966), stand for the proposition that actual force is not necessary, but rather only a threat of force sufficient to overcome the resistance of the female. *State v. Christensen,* at 335, cites 22 RCL 1185 as stating:

" 'Consent of the woman from fear of personal violence is void, and though a man lays no hands on a woman, yet, if by an array of physical force, he so overpowers her mind that she dares not resist or she ceases resistance through fear of great harm, the consummation of unlawful intercourse by the man would be rape.'

"*State v. Cook,* supra, approved an instruction to the effect that if the defendant threatened the girl and she was so terrified by the threats that she did not resist defendant's having intercourse with her, the defendant would nevertheless be guilty of rape.

"Clearly then, force which overcomes earnest resistance or the threat of force which places a person in fear of serious physical injury is recognized in Oregon as constituting 'forcible compul-

sion.' * * *" Proposed Oregon Criminal Code 114-115, Art 13, § 111 (1970).

Viewed against this background we conclude that the foregoing evidence clearly warranted submission of the cause to the jury.

By his second assignment, defendant challenges the trial judge's refusal to give the following requested instruction:

"* * * * *

"You are further instructed that you must be satisfied, from the evidence, beyond a reasonable doubt, that from the time Ronald Forsyth started the attempt to have intercourse with [prosecutrix] and until the act was accomplished, that [prosecutrix] at no time consented thereto during said time. If she upon that occasion at any time consented to have intercourse with Ronald Forsyth, he would not be guilty of the crime of rape."

■ Although he must state the contentions of both parties and charge on all issues raised by the testimony, the trial judge is not required to give a jury instruction in the form requested. *State v. Ollison*, 16 Or App 544, 519 P2d 393 (1974). If another instruction covering the subject is correct as to the law and is not misleading, there is no error in giving it rather than the requested instruction. *State v. Robinson*, 235 Or 524, 527, 385 P2d 754 (1963).

■ Here, contrary to defendant's assertion that the issue was ignored, the trial court instructed:

"In order to prove the charge of rape in the first degree against the defendant, the State must prove each of the following elements beyond a reasonable doubt:

"* * * * *

"3. That said [prosecutrix] did not consent to said sexual intercourse;

"\* \* \* \* \*."

The instruction adequately stated the law, being but an attenuated version of the requested charge. There was no error.

Defendant's next assignment challenges the refusal of the trial judge to admit the psychiatric testimony of Dr. Henry Dixon. Dr. Dixon read the prosecutrix's deposition and defendant's statement to the police, and observed the prosecutrix while she testified in court. On such basis, and without personally examining her, Dr. Dixon drew certain conclusions regarding the prosecutrix's mental status and personality. His written observations were admitted under an offer of proof, which was subsequently denied.

■ In *State v. Walgraeve,* 243 Or 328, 412 P2d 23, 413 P2d 609 (1966), also a rape case, our Supreme Court upheld the denial of defendant's motion to require the complainant to submit to a psychiatric examination. While not foreclosing the power of the trial judge in his discretion to order such an examination, *State v. Clasey,* 252 Or 22, 446 P2d 116 (1968), the court clearly expressed its concern over such procedures. Referring to the California case of *Ballard v. Superior Court,* 44 Cal Rptr 291 (1965), *vacated on other grounds* 64 Cal 2d 159, 49 Cal Rptr 302, 410 P2d 838 (1966), the court discussed the rationale for disallowing psychiatric examination of witnesses:

"\* \* \* The California court pointed out that if a witness was willing to submit to such examination no necessity for a court order would exist, and that the results of a psychiatric examination of a witness unwilling to volunteer for such an examination would be questionable at best. It then went on, at page 294:

"'\* \* \* We are also concerned with the

invasion of the jury's province to evaluate the credibility of the witness by subjecting the witness' testimony to attack by expert opinion based on an interview conducted outside the presence of the jury; the prospect of a parade of experts with conflicting opinions confusing rather than enlightening the jury; the delay of and detraction from the trial of the guilt or innocence of the accused by an excursion into the mental state of the witness; and the reluctance to report such crimes which the proposed rule would instill in the timid or those unwilling to bare their souls to the world. In any event such a fundamental change in policy should come from the Legislature which has the investigative machinery to fully evaluate the proposal, specify its limits and its mode of operation. The trial court properly denied the petitioner's request in this respect.' " 243 Or at 331.

*See also: State v. Jorgensen,* 8 Or App 1, 492 P2d 312 (1971), Sup Ct *review denied* (1972).

The reasoning of *Walgraeve* is applicable to the proposed psychiatric opinion testimony in this case. Moreover, the record reveals no compelling justification for such an examination.

Defendant next contends that the trial court over defendant's objection allowed a minister to testify in violation of the confidential communications privilege afforded the priest-penitent relationship.

The Reverend Jerome Larson of the First Baptist Church of Milwaukie, the prosecutrix's minister, met with the defendant at prosecutrix's suggestion. Defendant was neither a member of Reverend Larson's congregation nor a Baptist. After being assured by Reverend Larson that he would keep their conversation confidential, the defendant briefly discussed

the incident which is the subject of this case. At trial, Reverend Larson was called as a prosecution witness on rebuttal and testified as to that conversation.

The priest-penitent privilege is recognized in ORS 44.040(1)(c):

> "A priest or clergyman shall not, without the consent of the person making the confession, be examined as to any confession made to him in his professional character, in the course of discipline enjoined by the church to which he belongs."

However, ORS 44.040(2) qualifies that provision as follows:

> "If a party to the action, suit or proceeding offers himself as a witness, it is deemed a consent to the examination also of a wife, husband, attorney, clergyman, physician or surgeon, stenographer, licensed professional nurse, licensed psychologist or certificated staff member on the same subject."

■ Defendant "offer[ed] himself as a witness" by voluntarily taking the stand. *Nielson v. Bryson,* 257 Or 179, 477 P2d 714 (1970). On direct examination he denied the prosecutrix's assertion that she had hit him in the nose during the alleged rape incident. Reverend Larson was later called to the stand by the prosecution for the sole purpose of rebutting that statement, testifying that defendant had told him that prosecutrix did indeed strike him (defendant) in the nose. Without deciding whether the encounter between defendant and Reverend Larson would otherwise be encompassed by the priest-penitent privilege, it suffices for us to hold that there was no violation thereof by virtue of ORS 44.040(2). *Forrest v. Portland Ry. L. & P. Co.,* 64 Or 240, 129 P 1048 (1913);

*McNamee v. First Nat. Bk. of Roseburg,* 88 Or 636, 172 P 801 (1918).

Finally, defendant contends it was error to allow defendant's credibility to be impeached by a 1973 conviction in the state of Washington for carnal knowledge. He argues that because the conviction was pending on appeal at the time of trial, it should have been excluded.

■ ■ The predominant view in this country is that the pendency of an appeal from a criminal conviction does not bar the use of that conviction for impeachment purposes. McCormick, Evidence 87, § 43 (hornbook series, 2d ed 1972); Annotation, 16 ALR3d 726 (1967). In *State v. Anderson,* 10 Or App 34, 497 P2d 1218, Sup Ct *review denied* (1972), *appeal dismissed* 410 US 920 (1973), this court ruled that the fact that a defendant's prior felony conviction is pending on appeal does not operate to remove him from the operation of ORS 166.270, relating to ex-convicts in possession of firearms.

Moreover, we perceive no rational policy basis for making a distinction as to the admissibility of a prior conviction for impeachment purposes on the basis of the mere existence of a pending appeal. The filing of an appeal by itself casts no shadow on the integrity of the prior proceedings. We adopt the majority rule.

Affirmed.